UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

KENYATA WOODS,

                    Plaintiff,

v.

XCEL ENERGY,

                    Defendant.

Case No. 06-CV-5014 (PJS/JJG)


ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

---

Theresa A. Freeman, NEFF LAW FIRM, PA, for plaintiff.

Melissa Raphan and Nicole Haaning, DORSEY & WHITNEY LLP, for defendant.

Plaintiff Kenyata Woods brings claims of employment discrimination, harassment, retaliation, breach of contract, promissory and equitable estoppel, intentional infliction of emotional distress, and negligence against defendant Xcel Energy ("Xcel"). Xcel has moved for summary judgment on all of Woods's claims. For the reasons described below, Xcel's motion is granted in part and denied in part. Specifically, the Court denies Xcel's motion with respect to Woods's harassment claim, but grants it with respect to Woods's other claims.

I.  BACKGROUND

Woods, who is African-American, became a full-time, permanent employee of Xcel in June 2004, after first working for the company as a contract employee. Woods was hired as a rebate/load management representative; her main responsibility was entering data on a computer. Woods remained employed by Xcel until May 2005, when she was fired. This lawsuit arises out of that firing.

Xcel strongly disputes Woods's version of the events leading to her firing — and, as will be explained below, there is reason to believe that at least some of what Woods alleges may not be true. But in deciding a motion for summary judgment, "courts are required to view the facts

and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). Thus the Court will recount undisputed facts and recount disputed facts as Woods would have them.

### A. *Woods's Allegations of Harassment*

Shortly after Woods became a permanent employee, Xcel hired Yvonne Pfeifer, who became Woods's supervisor, and Deb Lutchen, who became one of Woods's coworkers. Both Pfeifer and Lutchen are white. Woods was responsible for training Lutchen. That task soon became frustrating for Woods, as the two women did not get along, and Lutchen required repeated retraining.

The reason why Woods and Lutchen did not get along (according to Woods) was that Lutchen was prejudiced against African-Americans and often made racially offensive remarks in the workplace. Woods can recall two occasions on which Lutchen called Woods a "dumb black girl" in Woods's presence. Woods Dep. 200-04. In addition, Woods often heard Lutchen making insulting remarks about Lutchen's African-American neighbors. Specifically, Lutchen said that she knew that her neighbors were drug dealers because they owned nice cars. Lutchen also called her neighbors "dumb black people" because they rented, rather than owned, their home. Woods Dep. 97. On one occasion, when Woods won a gift card during a team meeting for answering a work-related question correctly, Lutchen remarked, "one card for the bad girl." Woods Dep. 41. Lutchen would also sigh and use negative body language around Woods. Woods Dep. 166.

In her memorandum opposing Xcel's motion, Woods's attorney asserts that Woods "was subjected to hearing herself referred to as a 'nigger' by her co-worker Lutchen." Pl.'s Mem.

-2-

Opp. Summ. J. 18.  But there is no support for that assertion in the record.  Nowhere in Woods's deposition, Woods's affidavit, the complaint that Woods filed with Xcel, the complaint that Woods filed with the Equal Employment Opportunity Commission ("EEOC"), or the rest of the record does Woods or anyone else claim that Lutchen used the word "nigger" in Woods's presence.  Indeed, although Woods testified that *coworkers* told Woods that Lutchen had referred to her as "nigger girl" *outside* of Woods's presence, Woods specifically testified that she could not remember hearing Lutchen use that phrase.  Woods Dep. 366.

Lutchen made many other extremely offensive remarks outside of Woods's presence.  When talking to other coworkers, Lutchen would refer to Woods as "black bitch," "unproductive black girl," "dumb girl," and "dumb black girl."  Woods Dep. 97, 208, 210, 365-70; Woods Aff. ¶ 3.  Lutchen would also refer to other black people as "dumb," state that all black people are drug dealers, and use phrases such as "those black people."  Woods Aff. ¶ 3.  Several of Woods's coworkers told Woods about Lutchen's offensive remarks.  Woods Dep. 95-98, 208, 210, 365-70.  One of Woods's coworkers, Barb Olson, told Woods to stay away from Lutchen because Lutchen "had it out for [Woods]" and did not like African-Americans.  Woods Dep. 98.  In fact, Woods suspected that Lutchen's requests for retraining were intended to make Woods look bad and to "paint[] a picture about black people being dumb."  Woods Dep. 177.

Woods also offers the affidavit and testimony of her coworker Amber Buckner.  Buckner testified that Lutchen constantly made racially offensive remarks in Buckner's presence.  In particular, Buckner testified that Lutchen routinely referred to Buckner (who is African-American) as "girl" and "made comments about black people all the time and about her neighbors all the time."  Buckner Dep. 28; *see also* Buckner Dep. 75, 87-88, 105.  These comments included that "[Lutchen's] neighbors are drug dealers, and they're unproductive, and

they're lazy, and they're dumb, that they're selling drugs, and it's bringing her property value down" and that they're "dumb, stupid, lazy black people."  Buckner Dep. 28, 40.  Buckner recalls overhearing comments like this weekly.  Buckner Dep. 40.  Lutchen also called Buckner "girl" on a daily basis.  Buckner Dep. 87.  Buckner testified that Lutchen spoke in a voice loud enough to be overheard by other people working in the office.  Buckner Dep. 28, 30, 105.

Buckner also recalls several offensive comments that Lutchen made in Woods's presence — comments that Woods herself apparently does not remember.  For example, Buckner testified that Woods was present when Lutchen said that she "wasn't going on break with those black girls."  Buckner Dep. 62-63.  Woods was also present, according to Buckner, when Lutchen asked a coworker whether the coworker was going to lunch with "those black people or me."  Buckner Aff. at 3.  Buckner further alleges in an affidavit that Lutchen spoke directly to Buckner and Woods about Lutchen's neighbors, saying that her neighbors were stupid, unproductive drug dealers, unlike Woods and Buckner, whom Lutchen called "productive black people."  Buckner Aff. at 1, 2.  (In her deposition, however, Buckner testified that Woods was *not* present during this last conversation.  Buckner Dep. 25-26, 28, 64-65.)

### B.  Woods's Reports of Harassment

Woods spoke to Pfeifer (her supervisor) on several occasions about Lutchen.  The record evidence about these meetings is somewhat unclear, but it appears that Woods first met with both Pfeifer and Lutchen sometime in October 2004 and then met with Pfeifer again sometime before the end of 2004.  Woods Dep. 178-79, 387-88.  Woods's testimony is also somewhat vague about what she told Pfeifer during these meetings, but Woods did state that she told Pfeifer that Lutchen was a racist, that Woods was being subjected to a hostile work environment, and that Lutchen had called her a "dumb black girl."  Woods Dep. 178-79, 187, 199, 203.

Woods does not specifically remember when she reported the "dumb black girl" statement to Pfeifer, however. Woods Dep. 203.

On January 8, 2005, Woods made a formal written complaint about Lutchen to Xcel's workforce-diversity department. Lewis Aff. Ex. D. In support of her claim that Lutchen had engaged in racial harassment, Woods listed the following incidents in her complaint:

1. In August 2004, a coworker told Woods that Lutchen had asked where Woods was and, on being told that Woods was out sick, Lutchen sighed and said "yeah whatever."

2. In August 2004, a coworker told Woods that Lutchen had said that she did not like Woods and made unspecified "negative comments."

3. In October 2004, a coworker told Woods that Lutchen had often talked about Woods and believed that Woods did not like Lutchen.

4. In October 2004, Woods met with Pfeifer and Lutchen to discuss "issues and concerns."

5. In December 2004, a coworker told Woods that Lutchen had been checking Woods's work, had called Woods a "bitch," had made negative comments to the effect that Woods was unproductive, and generally had a "vendetta" against Woods (although the coworker "[didn't] know why").

6. In December 2004, a coworker told Woods that Lutchen had complained to Pfeifer that Woods was trying to "turn everybody against" Lutchen, that Lutchen was "watching [Woods's] every move," and that Lutchen would often remark on Woods's absence when Woods was on break or otherwise not at work.

7. In December 2004, Pfeifer asked Woods to train Lutchen on a specific task because Lutchen had claimed that Woods had not trained her on that task. Woods performed the training and then told Pfeifer that she thought Lutchen was trying to make her look incompetent.

8. In January 2005, after Woods won a gift card for answering a trivia question correctly, Lutchen said, "one card for the bad girl."

Lewis Aff. Ex. D.

Notably, although the purpose of Woods's complaint was to accuse Lutchen of racial harassment, Woods said nothing in her complaint about the highly offensive racial insults that Woods now claims Lutchen made.  For example, Woods did not report that Lutchen had twice called her a "dumb black girl" to her face or that Lutchen had referred to her as "nigger girl" in conversations with coworkers.  Instead Woods reported relatively trivial comments that Woods heard about secondhand and that, on their face, seem to have nothing to do with race.  Woods did testify that her list was not necessarily complete because she was just giving examples, but Woods also testified that she did not intentionally withhold any information and that "I gave them all of the information that I could think of at this date that I wrote this letter. . . . Some things I tuned out that I may not have remembered this day [I wrote the letter]."  Woods Dep. 36.

A few days after Woods submitted her complaint, Mary Lewis, an investigator with Xcel's workforce-diversity department, contacted Woods to schedule a meeting.  Lewis Aff. ¶ 6.  During her meeting with Lewis, Woods essentially reiterated the information in her written complaint and told Lewis that she could not think of any reason for Lutchen's hostility other than racial animus.  Lewis Aff. ¶ 7.  Again, while complaining of racial harassment, Woods did not mention any of the explicitly racist comments that Woods now claims Lutchen made.[1]

After talking with Woods, Lewis interviewed Pfeifer and several of Woods's coworkers.  In addition to the types of comments that Woods had already listed in her complaint, the coworkers reported hearing Lutchen make two comments with racist overtones outside of

---

[1]At oral argument, Woods's counsel represented that Woods had testified that she orally reported the explicitly racist comments to Lewis.  But Woods did not, in fact, provide such testimony.  The only assertion that Woods made about the substance of her meeting with Lewis was that Woods "provide[d] [Lewis] with additional information during the meeting."  Woods Dep. 25.  Moreover, conspicuously absent from Woods's affidavit is any assertion that Woods gave any information to Lewis other than what appears in Woods's written complaint.

-6-

Woods's presence:  Patricia Charbonneau reported that Lutchen had complained about not being able to understand Woods's "jive talk," and John Gill reported that Lutchen had said "they will miss work for any reason," which Gill took to be a veiled reference to African-Americans. Lewis Aff. ¶¶ 8-10, 13.

Lewis then questioned Lutchen, who acknowledged complaining about Woods and using the phrase "jive talk," although she could not remember calling Woods a "bitch" or making the comment that "they will miss work for any reason."  Lewis Aff. ¶ 11.  Lewis cautioned Lutchen to refrain from using terms like "jive talk" or making comments like "they will miss work for any reason" because such remarks could be construed as racist.  Lewis Aff. ¶ 11.  Lewis also warned Lutchen to mind her own business, pay attention to her own work, and use the company's e-mail system only for business-related purposes.  Lewis Aff. ¶ 11.

Lewis produced a written report of her investigation in which she concluded that Woods's allegations of racial harassment were unsubstantiated.  Lewis Aff. Ex. E.  Again, Woods had not reported any racist comments being made in her presence, and Lewis had learned of only two racist comments being made outside of Woods's presence — neither of which had been mentioned by Woods.  Lewis recommended that Pfeifer monitor behavior in the workplace and take action as necessary to resolve any conflicts.  Lewis Aff. ¶ 14 & Ex. E.  Lewis also called Woods and told her that Lewis did not think that Woods had been subjected to racial discrimination, but that Lewis thought that Woods had been subjected to general harassment and that the harassment needed to stop.  Woods Dep. 43-44.

The record is unclear concerning whether Lutchen's alleged racial harassment of Woods continued after Lewis's investigation.  Woods was not asked during her deposition whether the harassment continued after the investigation concluded, and the only specific comments that

Woods can remember predate the investigation.  *See, e.g.*, Woods Dep. 94, 200, 210, 369.  But Woods did testify that, in early February 2005 (three or four weeks after the investigation concluded), she asked Pfeifer for a reduced work schedule because she felt "overwhelmingly stressed with the discrimination that was going on in the workplace," and that, at the same time, she discussed with Pfeifer how she did not want to continue training Lutchen "because of her superior white attitude that she displayed toward [Woods]."  Woods Dep. 152-53.  Woods also alleges that Pfeifer began retaliating against her after she complained by ignoring Woods and subjecting Woods to negative body language.  Woods Aff. ¶ 6.

### C.  Woods's Misreporting of Hours

In September 2004, just a few months after Woods became a permanent employee, Pfeifer discovered that Woods had misreported the number of hours she worked on August 17 and August 27.  Pfeifer Aff. ¶ 3.  Specifically, Woods had worked four hours on the 17th and eight hours on the 27th, but she reported (and sought to be paid for) working eight hours on the 17th and nine and a half hours on the 27th.  Pfeifer Aff. ¶ 3.  Pfeifer met with Woods on September 17 to discuss the issue. Pfeifer Aff. ¶ 3.  Woods claimed that the error was due to the system automatically duplicating time entries from previous weeks.  Pfeifer Aff. ¶ 3.  A payroll employee, Vivian Olson, later explained to Woods that it was not possible for the system to automatically duplicate her hours without some input by Woods.  Pfeifer Aff. Ex. B.

The following week, on September 20, Pfeifer discovered that Woods had again misreported her time for several days in the preceding pay period.  Pfeifer Aff. ¶ 4.  These errors included reporting nine and a half hours of work on a day that Woods did not work at all, eight hours of work on a holiday, and nine and a half hours of work on a day that Woods worked for two hours.  Pfeifer Aff. ¶ 4 & Ex. C.  Pfeifer e-mailed Woods about the errors, told her to track

her hours more carefully, and invited her to respond with any questions or concerns.  Pfeifer Aff. Ex. C.  Woods apparently did not respond to the e-mail.

In early February 2005, Pfeifer discovered that Woods had misreported her time yet again.  This time, Woods reported that she worked eight hours on each of two days when she had not actually worked at all.  Pfeifer Aff. ¶ 6.  Pfeifer again met with Woods and again advised her to be more careful with her time reporting.  Pfeifer Aff. ¶ 6.  Over the next couple of days, Pfeifer observed Woods arrive late and leave early.  Pfeifer Aff. ¶ 7.  Pfeifer also noted that Woods was frequently away from her desk or on the phone and saw Woods give a coworker a neck rub during work hours.  Pfeifer Aff. ¶ 7 & Ex. A at 420.  Pfeifer met with Woods, who did not dispute Pfeifer's observations.  Pfeifer Aff. ¶ 8.  Pfeifer then contacted Mary Jane Griebler, an Xcel workforce-relations consultant.  Pfeifer Aff. ¶ 9; Griebler Aff. ¶ 3.  Greibler recommended that Pfeifer give Woods a written warning.  Griebler Aff. ¶ 3; Pfeifer Aff. ¶ 9.

With Pfeifer's input, Griebler prepared the warning, and both Griebler and Pfeifer met with Woods on February 25 to deliver it.  Griebler Aff. ¶ 5; Pfeifer Aff. Ex. D (written warning).  The warning outlined all of Woods's time-reporting errors and also characterized the neck rub as both inappropriate and a misuse of work time.  Pfeifer Aff. Ex. D.  The warning required Woods to "be honest and accurate in all aspects of [her] work and time reporting," to "accurately record [her] time and enter it daily," and "conduct [herself] in a professional manner" while at work.  Pfeifer Aff. Ex. D.  The warning concluded by advising Woods that if she failed to meet any of those requirements, she could be subject to more serious discipline.  Pfeifer Aff. Ex. D.  Written warnings are active for a period of nine months.  Griebler Aff. Ex. F; Pfeifer Aff. Ex. D.

Woods again tried to excuse the errors by claiming that they were the result of automatic duplication of previous time entries.  Pfeifer Aff. ¶ 10; Griebler Aff. ¶ 5.  Griebler responded

that Woods could appeal the written warning through Xcel's internal dispute-resolution process, and that, if she appealed, a panel made up of both managerial and non-managerial employees would review the relevant information and vote on whether to uphold the warning.  Griebler Aff. ¶ 5.  Griebler gave Woods the forms she needed to appeal, but Woods did not appeal the warning.  Griebler Aff. ¶ 5; Pfeifer Aff. ¶ 10.

During the following month (March), Woods twice failed to report any hours, forcing Vivian Olson to contact Pfeifer to ensure that Woods would get paid.  Pfeifer Aff. ¶¶ 11-12.  Pfeifer reminded Woods that Woods was required to enter her time daily.  Pfeifer Aff. ¶ 12.

### D.  Woods's Request for Reduced Hours and Application for Disability Benefits

About the time that Pfeifer discovered Woods's third instance of misreporting her time (that is, early February 2005), Woods asked Pfeifer for a reduced work schedule and gave Pfeifer a form from a certified nurse practitioner recommending that Woods's hours be reduced to thirty-two hours per week.  Woods Aff. ¶ 7.  Pfeifer denied Woods's request.  Woods Aff. ¶ 7.  Woods then applied for leave under the Family Medical Leave Act ("FMLA"), but that application was denied because Woods was not yet eligible for FMLA leave.  Woods Aff. ¶ 9.

Woods next applied for short-term disability benefits, after missing work during the entire week of March 7.  Woods Aff. ¶ 9.  Woods provided medical documentation that she was suffering from stress, and she also provided documentation showing that she had been caring for her sick child during the week that she was absent from work.  Woods Aff. ¶ 9.  VPA, Inc., which administers Xcel's short-term disability plan, denied Woods's claim for lack of objective medical evidence to support it.  Woods Aff. Ex. A.  In its denial letter, VPA also noted that someone at Xcel — VPA did not say who — had informed it that the majority of Woods's intermittent days off work were scheduled leave and not days on which Woods had called in

sick.  Woods Aff. Ex. A.  In Woods's appeal letter, she contended that most of her time off was

unscheduled and that she called in sick every day during the week of March 7 because she had

migraines and her son was sick.  Woods Aff. Ex. A.  Woods did not provide any additional

medical documentation, and her appeal was apparently denied.

### E.  Xcel's Investigation, Discipline, and Termination of Woods

On March 29, Pfeifer saw Woods arrive at work late, take a one-and-a-half-hour lunch

(she was entitled to only one hour), and then leave shortly after 5:00 p.m.  Pfeifer Aff. ¶ 13.

A few days later, one of Woods's coworkers told Pfeifer that Woods, who was enrolled in

massage-therapy school, was looking at massage-therapy websites during work hours.  Pfeifer

Aff. ¶ 13.  Pfeifer asked Griebler to look into Woods's Internet use and to investigate how much

time Woods actually spent at work on March 29.  Pfeifer Aff. ¶ 13.

Griebler interviewed Woods, who denied taking excessive lunches or breaks, denied

using the Internet for personal reasons except during breaks, and stated that on March 29 she had

worked from 8:30 a.m. to 5:00 p.m. with a one-hour break for lunch.  Greibler Aff. ¶ 7.  Griebler

told Woods that Griebler would be able to verify her work hours and Internet use and asked her

if she wanted to add anything else.  Griebler Aff. ¶ 7.  Woods did not.  Greibler Aff. ¶ 7.

Griebler then reviewed a report of activity for Woods's access badge as well as time- and date-

stamped photos from the building's security cameras.  Griebler Aff. ¶¶ 8-9.  (Because employees

do not need to use access badges to leave the work floor, and sometimes enter the work floor at

the same time as other employees, access-badge reports do not necessarily capture every time an

employee enters or leaves a work floor.  Jarpey Aff. ¶ 3.)  The photos showed that Woods left

the work floor twice that day, for about an hour each time, and returned from the second break

carrying a shopping bag.  Griebler Aff. ¶ 10; Jarpey Aff. Ex. A.  All told, the photos showed that

Woods worked less than six hours on March 29.  Griebler Aff. ¶ 10.  Woods had reported

working eight hours that day.  Pfeifer Aff. ¶ 14.

Griebler also obtained reports of Woods's Internet use, including details of the websites

Woods visited, for the period February 4 through March 5, 2005.  Griebler Aff. ¶ 13.  The report

showed that, on three days during that period, Woods spent more than an hour (in one case, more

than two hours) on the Internet visiting massage-therapy and other websites.  Griebler Aff.

Ex. D.  On six other days, Woods spent more than a half hour on the Internet.  Griebler Aff.

Ex. D.  Woods's job duties did not require her to access the Internet for any reason.  Pfeifer Aff.

¶ 15.

Xcel still did not terminate Woods.  Rather, based on her investigation, Griebler

recommended to Pfeifer that Woods be placed on decision-making leave.  Pfeifer Aff. ¶ 14;

Griebler Aff. ¶ 15.  According to Xcel's employee handbook, decision-making leave is "used

when an employee's commitment to improve is not met following an Oral or Written Reminder

or when an employee commits a very serious offense or has a very serious performance, conduct

or attendance problem, whether or not previous discipline has taken place."  Griebler Aff. Ex. F.

When a supervisor decides to place an employee on decision-making leave, the supervisor

prepares a memo outlining the specific performance or other problem and explaining how the

employee must improve.  Griebler Aff. Ex. F.  The supervisor then meets with the employee to

discuss the problem and gives her a copy of the memo.  Griebler Aff. Ex. F.  The employee is

given a day off with pay to review the memo and consider whether she can and will make the

required improvements.  Greibler Aff. Ex. F.

On April 11, Griebler and Pfeifer met with Woods to put Woods on decision-making

leave.  Pfeifer Aff. ¶ 17 & Ex. E.  Pfeifer gave Woods a memo stating, among other things, that

Woods "will not use Company computers, resources, equipment or time for personal business," that Woods will accurately record and enter her time daily, and that Woods's break times must be limited to one hour per day, including lunch.  Pfeifer Aff. Ex. E.  When Woods returned from the leave, she gave Pfeifer a letter stating that she accepted the conditions.  Pfeifer Aff. Ex. F. Pfeifer then gave Woods a second memo summarizing Woods's deficiencies, the disciplinary steps taken, and the fact that failure to meet any of the conditions could result in termination. Pfeifer Aff. Ex. G.

About a week later, Pfeifer discovered that Woods had failed to enter any time for the previous week or the current week.  Pfeifer Aff. ¶ 19.  Pfeifer reminded Woods that failing to enter her time daily was grounds for termination.  Pfeifer Aff. ¶ 19.  Several days later, Pfeifer concluded, based on her own observations, that Woods was spending an excessive amount of time on personal phone calls.  Pfeifer Aff. ¶ 20.  Pfeifer asked Griebler to investigate.  Pfeifer Aff. ¶ 20.  Griebler reviewed a report of the phone calls made from Woods's phone and discovered that, in April, Woods had made three phone calls lasting over one hour each. Griebler Aff. ¶ 18.  Griebler then interviewed Woods about her phone use.  Woods did not deny that the three calls were personal calls, but argued instead that the calls were not a problem because she was working while she was on the phone.  Griebler Aff. ¶ 19.[2]  After meeting with Woods, Griebler recommended to Pfeifer that Woods be terminated, and Pfeifer agreed. Griebler Aff. ¶ 20.  On May 5, 2005, Pfeifer and Griebler met with Woods to tell her that she was fired.  Griebler Aff. ¶ 20.

---

[2]Now, for purposes of this litigation, Woods also alleges that she needed to call home occasionally because Woods's mother, who provided childcare for Woods, was experiencing health problems.  Woods Aff. ¶ 11.  Woods claims that Pfeifer was aware of this issue and approved of Woods's periodic use of the phone to check in with her mother.  Woods Aff. ¶ 11.

*F.  Findings of the Unemployment-Law Judge*

After being fired, Woods applied for and received unemployment compensation, and

Xcel appealed that decision.  In July 2005, the unemployment-law judge ("ULJ") issued a

decision denying Xcel's appeal and finding that "[t]he evidence does not display clearly a

serious violation of the standards of behavior the employer has the right to reasonably expect of

the employee or a substantial lack of concern for the employment."  Woods Aff. Ex. B at 2.

*G.  Woods's EEOC Charge*

In November 2005, Woods filed a charge of discrimination with the EEOC.  Lewis Aff.

Ex. F.  Woods alleged that

> Starting in July of 2004, I was subjected to racial harassment,
> racial discrimination, age discrimination, and retaliation in my
> workplace.  I was required to train an older, white, female
> employee named Deb Lutchen, who became a permanent
> employee of Xcel Energy in July of 2004.  Ms. Lutchen repeatedly
> and derogatorily referred to African-American[s] as "those black
> people" "them people" and specifically referred to me to co-
> workers as that "black bitch."

Lewis Aff. Ex. F at 1.  She also stated that "I experienced age discrimination such that older

employees were treated differently and better than I was by my former employer."  Lewis Aff.

Ex F. at 4.  Notably, once again Woods failed to include many of the allegations that she now

makes in this lawsuit, including her allegations that Lutchen call her a "dumb black girl" to her

face and "nigger girl" in conversations with coworkers.  Woods has not suggested any

explanation for why, in pursuing a racial harassment claim with the EEOC, she chose not to

inform the agency of the strongest evidence she had of racial harassment.

-14-

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B.  Discrimination[3]

Xcel asserts, and Woods does not dispute, that Woods's claim of racial discrimination should be analyzed under the indirect method, using the familiar *McDonnell Douglas* framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Darke v. Lurie Besikof Lapidus & Co.*, 550 F. Supp. 2d 1032, 1041 (D. Minn. 2008) ("[W]hen the plaintiff's evidence is weaker, *McDonnell Douglas* gives the Court a framework for analyzing

---

[3]Woods's complaint mentions age discrimination, *see* Compl. ¶¶ 13, 35, but Woods does not appear to be pursuing such a claim, nor does she attempt to explain how she could meet the prima facie elements of such a claim (particularly in light of her argument to the EEOC that Xcel treated older workers *better* than younger workers).

whether the evidence is nevertheless sufficient to support a verdict of discrimination.").[4]  Under

this framework, Woods must show that: (1) she is a member of a protected class; (2) she was

meeting her employer's legitimate job expectations; (3) she suffered an adverse employment

action; and (4) similarly situated employees outside the protected class were treated differently.

*Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007); *Darke*, 550

F. Supp. 2d at 1042.  If Woods succeeds in establishing a prima facie case, Xcel must provide a

legitimate nondiscriminatory explanation for the adverse action.  *Canady v. Wal-Mart Stores,*

*Inc.*, 440 F.3d 1031, 1034 (8th Cir. 2006).  If Xcel does so, Woods must then establish that

Xcel's proffered explanation is pretextual and that discrimination is the real reason for the

adverse action.  *Id.*

     Woods argues that Xcel's denial of her request for reduced work hours, Xcel's

interference with her application for short-term disability benefits, the discipline to which she

was subjected, and her ultimate termination were all the result of racial discrimination.  The

Court examines each of these allegations in turn.

---

[4]In Woods's first claim for relief, titled "Race, National Origin/Ancestry and Color Discrimination," Woods cites both Minnesota law and federal law.  Compl. ¶ 53 (the numbering in Woods's complaint restarts at ¶ 50 after ¶ 54; this citation refers to the second ¶ 53).  Woods's remaining claims, and in particular her claims titled "Hostile Work Environment" and "Reprisal," cite only state law.  Compl. ¶¶ 67, 71.  But despite its title, Woods's first claim for relief discusses her harassment and retaliation claims as well as her discrimination claim, and the Court therefore understands Woods to be asserting these claims under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 and 2000e-3, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.08 and 363A.15.  Because the same analysis applies to claims under Title VII and the MHRA, the Court will not discuss Woods's state employment-discrimination claims separately.  *See Wittenburg v. Am. Express Fin. Advisors, Inc.*, 464 F.3d 831, 842 n.16 (8th Cir. 2006) (discrimination); *LaCroix v. Sears, Roebuck, & Co.*, 240 F.3d 688, 691 (8th Cir. 2001) (retaliation); *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 832 (8th Cir. 2002) (harassment).

## 1.  Reduced Work Hours

Woods argues that Pfeifer's denial of her request to work reduced hours was discriminatory because similar requests from white employees were granted.  When pressed, though, Woods can point to only one white employee who was allowed to work reduced hours: Theresa Lummis.  But Woods knows next to nothing about Lummis.  In particular, Woods does not know when Lummis asked to work reduced hours, what reason Lummis gave, who granted Lummis's request, or why the request was granted.  Woods Dep. 154-55.

Woods's evidence is insufficient even under what the Eighth Circuit has called the "low-threshold" test for determining whether employees were similarly situated at the prima facie stage.  *Cf. Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) (describing the two standards used in the Eighth Circuit and noting that the "low-threshold" standard requires that the employees are involved in or accused of the same or similar conduct and are disciplined in different ways).  To show that Lummis was similarly situated, Woods would, at a minimum, have to point to some evidence demonstrating that Lummis's reasons for requesting reduced hours were somewhat comparable to Woods's.  But Woods offers no such evidence.  Even if Woods had made out a prima facie case, the Court would nevertheless enter summary judgment in favor of Xcel on this claim, as Pfeifer has provided a legitimate nondiscriminatory explanation for denying Woods's request (as described below), and Woods has offered no evidence that Pfeifer's explanation is a pretext. Woods's claim of discrimination on the basis of Pfeifer's denial of request for reduced hours therefore fails.

## 2.  Short-Term Disability

Woods also argues that Xcel intentionally discriminated against her on the basis of race by informing VPA, the administrator of Xcel's short-term disability plan, that the majority of Woods's intermittent days off work were scheduled and not days on which Woods had called in sick.  There are several problems with this claim.  First, Woods identifies no similarly situated white employee who was treated differently.  Second, although the denial of short-term disability benefits could be considered an adverse action, there is no causal connection between Xcel's allegedly wrongful statement and the denial of benefits to Woods.  According to VPA's letter, VPA denied her claim because Woods provided no objective medical evidence to support her claim that she was unable to perform her job.  Woods Aff. Ex. A.  In response to that letter, Woods did not submit any additional medical evidence, but instead argued that she had actually called in sick during the week of March 7 both because of her migraines and because her son was ill (an argument that undermines her own claim that she was unable to work due to illness). It is not clear how Xcel could be held liable for a discriminatory denial of benefits when Xcel neither made the decision to deny benefits nor caused the administrator to deny benefits. Finally, Woods does not know who at Xcel communicated the information to VPA, and thus her argument that the communication was motivated by racial animus is pure speculation.  Woods's discrimination claim on the basis of Xcel's interference with her claim for short-term disability benefits therefore fails.

## 3.  Discipline and Termination

Finally, Woods alleges that both her discipline and her ultimate termination were the result of racial discrimination.  Xcel argues that Woods cannot make out a separate claim of discrimination on the basis of the discipline to which Woods was subjected because none of that

discipline constituted an adverse employment action.  This argument is largely academic, however, as the progressive discipline of Woods ultimately led to her termination, an act that was indisputably adverse.

Assuming that Woods has established a prima facie case of racial discrimination in connection with her discipline and termination, her claim nevertheless fails because no reasonable jury could find that Xcel's proffered reason for those actions was pretextual.  As described earlier, Woods's misconduct in the reporting of her hours and in her misuse of the phone and Internet is well-documented and essentially undisputed.  Xcel gave Woods numerous chances, over a period spanning almost nine months, to correct her behavior, yet Woods continued to violate the conditions under which Xcel permitted her to keep her job.

Woods argues that Xcel's reasons for disciplining and terminating her are nevertheless pretextual because white employees engaged in the same misconduct and were not disciplined or terminated.  Specifically, Woods claims that white employees also failed to properly record their time and used the phone and the Internet for personal reasons.  There are several problems with Woods's argument:

First, there is no evidence that any white employee did *all* of these things, as did Woods.  Obviously, a white employee who has just used the Internet for personal reasons is not similarly situated to an employee who has used the Internet for personal reasons *and* used the phone for personal reasons *and* failed to properly record her time.

Second, there is no evidence that the infractions committed by white employees were similar in number or nature to the infractions committed by Woods.  An employee who uses the phone for personal reasons for a few minutes is not similarly situated to an employee who makes at least three personal phone calls exceeding an hour.  An employee who makes a couple of

minor errors in entering time is not similarly situated to an employee who repeatedly makes

significant errors after being warned to be more careful entering her time.

Third, there is no evidence about any interaction with white employees about possible

misconduct.  An employee who truthfully admits an error in entering her time, expresses regret,

and vows to do better is not similarly situated to an employee who gives an implausible

explanation.  Nor is an employee who truthfully admits using the Internet for personal reasons or

taking excessively long breaks similarly situated to an employee who lies about both.

Fourth, there is no evidence that any white employee who committed a workplace

infraction was on probation at the time of the infraction, as was Woods.  Needless to say, an

employee who has been formally disciplined and put on probation for past infractions is not

similarly situated to an employee who has not.

Finally, and most importantly, Woods has offered no evidence that Pfeifer or any other

manager at Xcel was *aware* of the infractions allegedly committed by white employees.[5]  *Cf.*

*Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (noting the

plaintiff's failure to offer any proof that management was aware of other employees' allegedly

similar misconduct).  Obviously Pfeifer cannot be accused of discriminating when she took

action in response to infractions of which she was aware but did not take action in response to

infractions of which she was not aware.  Woods suggests that she was unfairly put under a

microscope, but of course the fact that Woods repeatedly sought to be paid for hours that she had

---

[5]At oral argument, Woods's counsel claimed that both Woods and Buckner had testified that Pfeifer must have been aware of other employees' misuse of the phone and the Internet because it was so pervasive.  There is, in fact, no such testimony in the record.  To the contrary, Woods testified that she did not know whether Pfeifer was aware of other employees' phone and Internet usage.  Woods Dep. 229-31, 233.

not worked — a fact that she does not dispute — is what attracted Pfeifer's attention in the first place.  Having failed to offer evidence of any similarly situated white employees who were treated differently, Woods cannot establish pretext.  *Cf. Wheeler v. Aventis Pharms.*, 360 F.3d 853, 858 (8th Cir. 2004) (the burden of establishing "similarly situated" at the pretext stage is "rigorous" and requires proof that the employees were similarly situated "in all relevant respects").

Woods also points to the findings of the ULJ to argue that she was not terminated for misconduct.  There are at least three problems with Woods's attempt to use the ULJ's findings as evidence of pretext.  First, Minnesota law prohibits the use of a ULJ's findings as evidence in any separate or subsequent action in any other forum.  Minn. Stat. § 268.105, subd. 5a.  Second, even assuming that § 268.105 does not bar the admission of the ULJ's findings in this federal forum, the findings are hearsay and thus would not be "admissible in evidence."  Fed. R. Civ. P. 56(e)(1); *cf., e.g.*, *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1286-87 (11th Cir. 2001) (judicial factual findings are hearsay that do not come within the public-records exception to the hearsay rule).  Finally, even if the ULJ's findings were admissible, they would not support an inference of pretext; if anything, they would support Xcel's position that it terminated Woods for excessive phone usage.  After all, the ULJ expressly found that "Xcel discharged Woods for excessive use of the telephone while on probation."  Woods Aff. Ex. B.  The ULJ then went on to conclude that Woods's conduct did not render her ineligible for unemployment compensation because it did not meet the high standard for employee misconduct as defined by Minnesota law. That latter finding is irrelevant to the issue in this case, which is whether Xcel terminated Woods because of her workplace misconduct (serious or not) or because of her race.

Finally, Woods quibbles about Xcel's proffered reasons — arguing, for example, that Xcel has no proof that she actually used the Internet during work time, and contending that Pfeifer knew of Woods's need to call home periodically.  The first assertion is untrue; Woods's allotted break and lunch time each day totaled one hour, and Xcel has proof that Woods used the Internet for more than an hour on several occasions.  More importantly, the assertion is irrelevant.  The question is not whether Xcel was *correct* in concluding that Woods used the Internet for personal reasons during work time; the question is whether Xcel's conclusion, correct or not, was the basis for its adverse actions against Woods.  Nothing in the record provides any reason to doubt the sincerity of Xcel's claim that it fired Woods in part because she used the Internet when she was supposed to be working.

It is similarly irrelevant that Woods thought that, because her mother was ill, Woods had the right to spend hours on the phone so long as, in Woods's opinion, her work was not affected.  Xcel had the right to terminate Woods on the basis of what Xcel concluded was Woods's excessive phone usage, so long as that reason was not mere pretext for racial discrimination.  Again, nothing in the record would permit a reasonable jury to doubt the sincerity of Xcel's claim that it fired Woods in part because she engaged in lengthy personal phone calls while she was supposed to be working.

In short, Woods has not offered any evidence suggesting that Xcel was looking for a pretext to disguise a racially motivated termination.  To the contrary, Xcel time and again offered Woods the chance to correct her misconduct before it finally terminated her.  On this record, no reasonable jury could find that Xcel discriminated against Woods on account of her race when it disciplined and then fired her.

## C. Retaliation

Like her discrimination claims, Woods's retaliation claims are analyzed under the

*McDonnell Douglas* burden-shifting framework. *Recio v. Creighton Univ.*, 521 F.3d 934, 938-

39 (8th Cir. 2008). To establish a prima facie case of retaliation, Woods must show that: (1) she

engaged in protected conduct; (2) a reasonable employee would have found the challenged

retaliatory action materially adverse; and (3) the materially adverse action was causally linked to

the protected conduct. *Carpenter*, 481 F.3d at 618.

Woods contends that Pfeifer's denial of her request for reduced work hours, Xcel's

interference with her application for short-term disability, the discipline to which she was

subjected, and her ultimate termination were all in retaliation for her complaints about Lutchen's

harassment. Woods also claims that Pfeifer retaliated against her by treating her rudely and

ignoring her.

Woods's claims of retaliatory discipline and termination fail for the same reason that her

claims of discriminatory discipline and termination fail: no reasonable jury could find that

Woods was disciplined and terminated for any reason other than Woods's longstanding, well-

documented, and essentially undisputed misconduct — misconduct that began before Woods

ever complained of discrimination. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th

Cir. 1999) (an employee's intervening misconduct erodes any inference of a causal link between

protected conduct and a challenged retaliatory action). Similarly, Woods's claim of retaliatory

interference with her application for short-term disability fails because, as noted earlier, Woods

does not know who communicated with the benefits administrator and therefore cannot establish

any causal link between her protected conduct and Xcel's actions. With respect to Woods's

claim that Pfeifer retaliated against her by giving her the cold shoulder, such conduct does not

constitute a materially adverse action.  *See Recio*, 521 F.3d at 940-41 (ostracism and the "silent treatment" amounted to no more than "nonactionable petty slights" that were not materially adverse) (citations and quotations omitted).

Pfeifer's denial of Woods's request for reduced work hours presents a closer question, inasmuch as Pfeifer denied Woods's request shortly *after* Woods made a formal written complaint of discrimination, and Pfeifer knew about Woods's complaint.  Nevertheless, Woods has failed to offer evidence sufficient to permit a reasonable jury to reject Pfeifer's testimony that her denial of Woods's request had nothing to do with Woods's earlier complaint of discrimination.  Pfeifer testified that she could not grant Woods's request for reduced hours in light of the department's heavy workload — a workload that was so heavy that Xcel was hiring contract workers to help meet it.  Pfeifer Aff. ¶ 25.  Contemporaneous documents support Pfeifer's testimony that her department had a heavy workload and was bringing in contract workers at the time that Woods asked to reduce her hours.  *See* Pfeifer Aff. Ex. D (Feb. 25, 2005 memo from Pfeifer to Woods stating that "we also discussed how this is a critical time for our department and we need all to focus on completing the necessary tasks to prepare for the CRS Phase 3 conversion").  Also supporting Pfeifer's testimony is the fact that Pfeifer has never given an employee permission to work part-time.  Pfeifer Aff. ¶ 25 n.6.  (Theresa Lummis, the one Xcel employee working reduced hours, received permission long ago from a predecessor of Pfeifer.  *Id.*)

There is some debate within the Eighth Circuit about whether the temporal proximity of protected conduct and adverse action is sufficient to establish causation for purposes of making out a *prima facie case* of retaliation, but there is no debate that temporal proximity is not sufficient to show pretext — that is, to overcome a showing by the employer that the adverse

action was unrelated to the protected conduct.  *Green v. Franklin Nat'l Bank of Mpls.*, 459 F.3d

903, 915-16 (8th Cir. 2006) (stating that the court need not decide the question of when or

whether timing alone can establish a prima facie retaliation claim because timing alone is

insufficient to show pretext).  Woods can point to nothing but temporal proximity in this case.

Moreover, the temporal proximity in this case is particularly weak evidence of pretext because

the timing of Pfeifer's denial was outside Pfeifer's control.  Pfeifer did not, on her own initiative,

decide to take adverse action against Woods.  Rather, Woods made the request for a reduced

work schedule shortly after Woods had filed her discrimination complaint, and Pfeifer had to

respond to Woods's request.  In short, because the only evidence supporting Woods's retaliation

claim is temporal proximity, and because that evidence is insufficient to permit a reasonable jury

to find pretext, Wood's claim must be dismissed.

### D.  Harassment

To prevail on her claim that Xcel maintained a racially hostile work environment, Woods

must show that: (1) she is a member of a protected group; (2) she has been subjected to

unwelcome harassment; (3) the harassment was because of her membership in the protected

group; (4) the harassment affected a term, condition, or privilege of her employment; and (5) the

employer knew or should have known about the harassment and failed to take proper remedial

action.  *Green*, 459 F.3d at 910.

Xcel argues that Woods's harassment claim fails because the harassment was not severe

or pervasive enough to be actionable.  For harassment to be actionable under Title VII, it must be

so severe or pervasive that it alters the conditions of the plaintiff's employment and creates an

abusive working environment.  *Carpenter*, 481 F.3d at 618.  The environment must be hostile or

abusive both as it would be viewed objectively by a reasonable person and as it was actually

-25-

experienced by the plaintiff.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).  Whether an environment is hostile or abusive is determined by looking at all the circumstances, including the frequency and severity of the discriminatory conduct; whether the conduct was threatening or humiliating, or merely an offensive utterance; and whether the conduct unreasonably interfered with the employee's work performance.  *Id.* at 23.

Although this is a close case, the Court concludes — after viewing the evidence as a whole, and assuming the facts are as Woods alleges — that Woods has offered sufficient evidence to create an issue of fact about whether Lutchen's conduct created a hostile work environment.  Xcel argues that Woods can only identify two instances of racially offensive comments that Lutchen made to her, and that because Lutchen made the remaining offensive comments outside of Woods's presence, the evidence is insufficient to show a hostile work environment.  But Xcel is not entirely correct:  Woods recalled not only the two "dumb black girl" statements, but also "numerous" offensive discussions of Lutchen's African-American neighbors being "dumb" and "drug dealers" and "unemployed," and Woods testified that Lutchen made such comments "on a daily basis."  Woods Dep. 97, 199.

Moreover, Xcel's argument does not take into account the testimony of Amber Buckner, Woods's coworker.  Buckner's testimony is consistent with and largely echoes Woods's testimony while at the same time providing a more complete picture of the environment at Xcel.  For example, Buckner recalled that Lutchen commented that her neighbors were "dumb, stupid, lazy black people" and that Lutchen made these kinds of comments "weekly."  Buckner Dep. 40.  Buckner also testified that Lutchen called Buckner "girl" on a "daily" basis, Buckner Dep. 87, and that Lutchen was always saying "black this, black that, these black people" while speaking loud enough that "anyone could hear her," Buckner Dep. 105.  Buckner also recalls two

-26-

incidents in which Lutchen, in Woods's presence, made derisive comments about another coworker spending time with "those black people" or "those black girls" (meaning Buckner and Woods).  Buckner Dep. 62-63; Buckner Aff. at 3.  True, Woods did not testify about many of these incidents or include them in her affidavit, which weakens the evidentiary value of Buckner's testimony.  But that does not mean that the Court can simply ignore Buckner's testimony, particularly in light of the fact that Woods testified that she could not remember all of Lutchen's conduct but that it was "repeated" and "happened on a daily basis."  Woods Dep. 199.

Aside from comments that were addressed to or overheard by Woods and Buckner, both Woods and Buckner heard secondhand accounts about Lutchen's offensive racial insults, including her use of the repulsive epithet "nigger girl" in referring to Woods.  It is true that those comments carry less weight because Lutchen made them outside of Woods's presence.  But they provide additional context supporting Woods's allegations of harassment and are relevant for the purpose of demonstrating that Lutchen's offensive conduct was pervasive.  *Cf. Howard v. Burns Bros., Inc.*, 149 F.3d 835, 838 (8th Cir. 1998) (harassment of employees other than the plaintiff is relevant to show the pervasiveness of the hostile environment).

Finally, although it is possible to argue that the conduct that Woods actually witnessed was not as severe as in many cases in which the Eighth Circuit has upheld a grant of summary judgment, Woods can prevail by establishing that the harassment was *either* severe *or* pervasive enough to alter a term or condition of her employment.  *Bowen v. Mo. Dep't of Social Servs.*, 311 F.3d 878, 884 (8th Cir. 2002) ("A claimant need only establish discriminatory conduct which is either pervasive or severe.").  Given the testimony that Lutchen made offensive comments "weekly" or "on a daily basis," the Court believes that Woods has offered sufficient

evidence to create a factual question concerning whether the harassment was pervasive enough to alter the terms and conditions of her employment.[6]

Xcel next argues that Woods's claim fails as a matter of law because Woods admitted that the harassment did not prevent her from performing her job.  Although the effect of the harassment on Woods's job performance is relevant, "[h]arassment need not be so extreme that it produces tangible effects on job performance or psychological well-being to be actionable." *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999).  Under Xcel's theory, Woods would not have a racial harassment claim even if Lutchen had daily subjected Woods to a continuous stream of racial invective, as long as Woods was able to keep inputting data into the computer. Title VII is not so toothless.

Finally, Xcel argues that Woods has failed to show that Xcel knew or should have known of the harassment and failed to take proper remedial action.  To the contrary, Xcel argues, Woods failed to report most of the alleged harassment and, with respect to the harassment that Woods did report, Xcel promptly investigated and put an end to it.  The problem with Xcel's argument is that Woods testified that she reported Lutchen's "discrimination" to Pfeifer, which "discrimination" Woods describes as "Ms. Deb Lutchen calling me a 'dumb black girl,' calling me a 'black bitch,' calling me 'unproductive,' looking for me, asking Mr. John Gill, 'where is the unproductive black girl,' the black neighbors being dumb and drug dealers and unemployed . . . ."  Woods Dep. 199.  Woods also specifically testified that she reported the

---

[6]Xcel also complains that some of Lutchen's conduct on which Woods's harassment claim depends was not explicitly race-based.  But Woods has alleged many explicit racial slurs. These slurs "permit an inference that racial animus motivated not only [Lutchen's] overtly discriminatory conduct but all of her offensive conduct towards [Woods]."  *Bowen*, 311 F.3d at 884.

"dumb black girl" remark to Pfeifer. Woods Dep. 203. The Court must assume that this testimony is true for purposes of ruling on Xcel's summary judgment motion, and the testimony is sufficient to create an issue of fact as to what Woods told Pfeifer about Lutchen's conduct.

Whether Xcel took proper remedial action is a close question. On this issue, as on so many others, the record is simply not clear. But looking at the evidence in the light most favorable to Woods, there is evidence that Woods reported Lutchen's harassment to Pfeifer in October 2004. Moreover, there is some indirect evidence that Woods continued to experience harassment after Xcel investigated her complaint. *See* Woods Dep. 152-53 (testifying that when Woods requested a reduced work schedule in February 2005 she also complained "about how Ms. Deb Lutchen was discriminating" and about Lutchen's "superior white attitude"). In light of this evidence, whether Xcel's response in January 2005 can be considered proper remedial action is a factual question for the jury. *Cf. Carter*, 173 F.3d at 702 (noting that factors in assessing the reasonableness of remedial action include the amount of time that elapsed between the complaint and the remedial action and whether the action ended the harassment).

In sum, the Court holds that Woods has offered sufficient evidence on each element of her harassment claim to survive summary judgment.[7] The Court takes no pleasure in this holding. As explained above, there is substantial reason to believe that Woods has succeeded in avoiding summary judgment only by providing false testimony. Also as explained above, in

---

[7]In its reply brief, Xcel argues that events prior to November 2004 are outside the limitations period for her MHRA claim and that events prior to January 2005 are similarly time-barred with respect to her Title VII claim. It is not clear whether Xcel is making this argument only with respect to Woods's discrimination claims or if it is also meant to apply to Woods's harassment claim. In any event, however, Xcel raised this argument for the first time in its reply brief, and the Court therefore will not consider it. *See Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871, 878 (D. Minn. 2007) (courts do not consider arguments made for the first time in a reply brief).

opposing Xcel's motion, Woods's attorney made several assertions that were either unsupported or flatly contradicted by the record.  But in ruling on Xcel's motion, the Court must assume that the facts alleged by Woods are true, and the Court must avoid making credibility determinations.  In light of those constraints, the Court must deny Xcel's motion for summary judgment with respect to Woods's harassment claim.

### E.  Woods's Remaining Claims

In her "kitchen-sink" complaint, Woods also brings claims of breach of contract, promissory and equitable estoppel, intentional infliction of emotional distress, and negligent supervision, training, and retention.  The reason for asserting these claims is not apparent.  Woods admitted at oral argument that these claims are all based on the same conduct that underlies her statutory employment-discrimination claims and that she is seeking to recover the same damages under these claims that she would recover if she prevailed on her statutory claims.

It is undisputed that Woods was an at-will employee and that Xcel's employee handbook expressly states that it does not create a contract.  Lewis Aff. Ex. C ("Nothing in this handbook is intended to be or should be construed as an express or implied contract."); *Ewald v. Wal-Mart Stores, Inc.*, 139 F.3d 619, 622 (8th Cir. 1998) (under Minnesota law, an employer's clear disclaimer of intent to form a contract precludes the formation of a contract based on an employee handbook); *Aberman v. Malden Mills Indus., Inc.*, 414 N.W.2d 769, 772-73 (Minn. Ct. App. 1987) (if a promise was not sufficient to support an employment contract, it is not sufficient to support a claim of promissory estoppel).  Woods cites no authority for the proposition that she can maintain separate breach-of-contract or estoppel claims on the sole basis that her employer violated Title VII and the MHRA.  These claims are therefore dismissed.

With respect to Woods's negligence claims, Minnesota does not recognize a cause of action against an employer for negligent training of an employee. *Johnson v. Peterson*, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007).  Although Minnesota courts have held that a claim for negligent retention may be maintained when an employee is subjected to harassment, there must be some evidence of a threatened or actual physical injury resulting from the harassment. *Bruchas v. Preventive Care, Inc.*, 553 N.W.2d 440, 442-43 (Minn. Ct. App. 1996).  Similarly, some form of physical injury is necessary to recover under a claim of negligent supervision. *Id.* at 443.  As Woods testified that Lutchen never physically threatened her, Woods Dep. 95, Woods's negligence claims must fail.

Finally, although it may theoretically be possible for Woods to maintain a claim of intentional infliction of emotional distress on the basis of racial harassment, Minnesota requires a very high showing of emotional distress. *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 868-69 (Minn. 2003) (plaintiffs must meet a "high threshold of proof regarding the severity of the mental distress").  Woods has not made such a showing.  She saw a therapist once during her employment, she is not currently being treated for emotional distress of any kind, and she has never been diagnosed with or sought treatment for depression, anxiety, loss of appetite, or insomnia.  Woods Dep. 9, 12-13; *cf. Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 440 (Minn. 1983) (testimony that the plaintiff was depressed, vomited, had stomach disorders, and developed a skin rash and high blood pressure was insufficient to establish requisite mental distress because the plaintiff never missed work and "[m]edical evidence as to [the plaintiff's] injuries is conspicuously absent from the record").  Woods's claim for intentional infliction of emotional distress is therefore dismissed.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      Defendant's motion for summary judgment [Docket No. 32] is GRANTED IN

PART AND DENIED IN PART.

2.      Defendant's motion is GRANTED with respect to plaintiff's claims of

discrimination, retaliation, breach of contract, promissory and equitable estoppel,

intentional infliction of emotional distress, and negligent supervision, training,

and retention, and these claims are DISMISSED WITH PREJUDICE AND ON

THE MERITS.

3.      Defendant's motion is DENIED in all other respects.

Dated: July 22, 2008

 s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge